UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>Gregory A. JONES,<br>                        Defendant. | Crim. No. 16-516 (KM)<br><br>**MEMORANDUM and ORDER**<br>(Pretrial motions: Eyewitness identification issues) |

The defendant, Gregory A. Jones, is charged with two robberies of the same bank: one, unarmed, on May 6, 2014 ("Bank Robbery 1"); and another, armed, on September 19, 2014 ("Bank Robbery 2"). This Opinion decides the defendant's pretrial motions relating to bank employees' eyewitness identifications of Mr. Jones as the robber.

I.  **These Motions**

This matter was opened to the Court as part of the defendant's omnibus motions (ECF no. 25). The government filed a consolidated response. (ECF no. 27) I heard oral argument on February 21, 2017, and ruled orally on most of the motions. (*See* Order, ECF no. 29, reflecting oral rulings.)

Included in the omnibus motions were motions to exclude certain witnesses' eyewitness identifications of Mr. Jones, citing both constitutional and Rule 403 grounds. (I will call these the "Eyewitness ID Motion" and the "Rule 403 Motion".) At oral argument on February 21, 2017, defense counsel made an oral motion to introduce expert testimony as to factors bearing on the reliability of eyewitness identifications, and requested an adjournment of the trial date, currently scheduled for March 6, 2017. The extra time was required, he said, to permit retention of such an expert and related preparation for trial. (I will call this the "Expert Motion".) Counsel represented, in his client's presence, that the defendant consented to such an adjournment. The government requested the opportunity to respond in writing to the oral Expert

Motion, and I set an accelerated briefing schedule. Believing that the Eyewitness ID and the Expert issues were intertwined, I reserved decision on both.

The following day, February 22, 2017, I had a brief telephone conference with counsel for the government and the defendant. They expressed agreement that the controlling authorities on the Expert Motion issues were *United States v. Brownlee,* 454 F.3d 131 (3d Cir. 2006), and *United States v. Downing,* 753 F.2d 1224 (3d Cir. 1984). The government generally agreed that the defense should be permitted to introduce the testimony of an eyewitness identification expert, but reserved its objections to the specific contents of such testimony. Both sides consented to an adjournment of the trial date because the current schedule would not allow for the defense's retention of such an expert, the preparation of a report, and other associated tasks.

I resolve the motions as follows:

The Eyewitness ID Motion to exclude the witnesses' testimony is denied.

The related Rule 403 Motion is denied, but certain safeguards will be required in connection with the presentation of the eyewitness testimony.

The Expert Motion is granted in part, insofar as the defendant is granted a continuance to obtain an expert report, and the Court grants leave to introduce expert testimony on the reliability of eyewitness identifications. Rulings as to particular portions of the expert opinion testimony may be required when the report is proffered and any objections are submitted; to that extent, the Expert Motion will remain pending.

## II.     Facts and Procedural History Relevant to the Motions

Bank Robbery 1, on May 6, 2014, was accomplished by the robber's passing a threatening note to a teller ("Teller 1") demanding money. While Teller 1 was complying, the robber uttered a number of threats, which were heard by the occupants of the bank, including Teller 1 and the manager ("Bank Manager"). The witnesses were only able to observe the robber's general physical appearance; the robber's face was almost entirely obscured by a scarf, glasses, and a hat.

2

Witnesses saw the robber run from the bank and saw a dye pack explode in his hands, creating a red mist. The robber removed his scarf, glasses, and hat, and left them on the ground. He ran away.

Shortly thereafter, Newark Police officers and an FBI agent arrived at the bank and interviewed witnesses, including Teller 1 and the Bank Manager. They collected the items the robber had dropped. The scarf, glasses, and hat were swabbed for DNA analysis.

Bank Robbery 2 occurred about four months later, on September 19, 2014. This time, the robber was not wearing anything that obscured his face. He displayed a gun, which he pointed at bank employees and fired at the ceiling. The Bank Manager, Teller 1, and a second teller ("Teller 2") were present; all three saw the robber's face, and heard him speak.

After Bank Robbery 2, Newark Police officers and FBI agents again interviewed witnesses at the bank. Teller 1 and the Bank Manager stated that, based on the robber's physical appearance and voice, they believed he was the same person who had committed Bank Robbery 1.

In December 2014, lab results revealed a match between a data bank reference DNA sample obtained from Mr. Jones and the DNA collected from the glasses discarded after Bank Robbery 1. Further tests were performed. In February 2015, lab results confirmed a match between a second DNA sample taken from Mr. Jones and the DNA taken from the scarf, glasses, and hat dropped near the scene of Bank Robbery 1.

On April 7, 2015, the State charged Mr. Jones with Bank Robbery 1 (but not Bank Robbery 2). The record does not disclose any further effort to investigate either Bank Robbery, or any further interviews of the bank employees, in the two-month period between the final DNA results and the filing of those State charges.

In April 2015, after the filing of the State charges relating to Bank Robbery 1, the Essex County Prosecutor's Office of Victim Witness Advocacy sent a standard letter (the "Victim/Witness Letter") to Teller 1. Although Teller 1 did not keep the Victim/Witness Letter, the government introduced a copy of

3

the standard form of letter. The government concedes that the Letter, in addition to informing Teller 1 of her rights, would have identified Mr. Jones by name as the person charged with Bank Robbery 1.

Now aware of Mr. Jones's name, Teller 1, Teller 2, and the Bank Manager went online and found a website containing copies of mugshots (*i.e.*, arrest photos). There is no dispute that this was a privately-run website, not a government website.[1] They retrieved from this website a mugshot of Gregory Jones from a prior arrest. They concluded that this photo of Jones depicted the face of the man who committed Bank Robbery 2.

On April 30, 2015, FBI Special Agents returned to the bank. Before they had asked any identification-related questions, Teller 1 and the Bank Manager revealed their online search. They volunteered that they, along with Teller 2, had seen the mugshot photo online; that it depicted the man who committed Bank Robbery 2; and that they believed, based on his voice and general appearance, that the same man had committed Bank Robbery 1.

On January 8, 2016, federal charges were filed *via* a criminal complaint, Mag. No. 16-3504 (ECF no. 1). Those federal charges—bank robbery, armed bank robbery, and use of a firearm during a crime of violence—encompassed both Bank Robbery 1 and Bank Robbery 2. On January 25, 2016, the State complaint was dismissed; a State grand jury never voted on the charge.

On November 10, 2016, a federal grand jury returned the Indictment in this case. Count 1 of the Indictment (ECF no. 14), directed to Bank Robbery 1, charges bank robbery, in violation of 18 U.S.C. § 2113(a); Count 2, directed to Bank Robbery 2, charges armed bank robbery, in violation of 18 U.S.C. § 2113(a) & (d); and Count 3, also directed to Bank Robbery 2, charges brandishing and discharge of a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).

---

[1] The website now seems to have been taken down. The government has furnished a screen shot of a page from the website, containing a mugshot of Mr. Jones, downloaded on May 14, 2015.

4

### III. Eyewitness ID Motion

The Eyewitness ID Motion asserts that the bank employees' eyewitness identification of Mr. Jones was irretrievably tainted by their exposure to the online mug shot. This, says the defendant, was the equivalent of a government-arranged, suggestive identification procedure. He moves that all out-of-court and in-court identifications of him by Teller 1 and the Bank Manager be excluded from evidence on due process grounds.[2]

The Constitutional argument has some novel features worthy of discussion, but in my view it does not succeed. In general, of course, the reliability of evidence is a matter for the judgment of the fact finder, within the confines of the Rules of Evidence. Due process, however, may prohibit the admission of evidence where fundamental unfairness would result. *See, e.g., Dowling v. United States*, 493 U.S. 342, 352–53, 110 S. Ct. 668, 674 (1990).

Such due process concerns are triggered by police-conducted, unnecessarily suggestive out-of-court identification procedures which create a substantial likelihood of irreparable misidentification. Two classic cases, synthesizing established principles, are *Neil v. Biggers*, 409 U.S. 188 (1972), and *Manson v. Braithwaite*, 432 U.S. 98 (1977). They require that where the police identification procedures flunk a due process analysis, the Constitution requires pretrial suppression of the identification evidence.

The Third Circuit has usefully summarized the background principles of law thus:

> To determine whether an out-of-court identification procedure violated due process, we conduct a two-step inquiry. First, we assess whether the police used an identification procedure that was unnecessarily suggestive. *Perry v. New Hampshire*, [565] U.S. [228], 132 S. Ct. 716, 724, 181 L. Ed. 2d 694 (2012). In answering the question of whether a show-up identification was impermissibly suggestive, "each case must be considered on its own facts." *Neil v. Biggers*, 409 U.S. 188, 196, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972) (quotation marks omitted). Even where the

---

[2] In the alternative, he argues that the employees' identification of him is so unreliable that it should be excluded under the balancing test of Fed. R. Evid. 403. *See* Section IV, *infra*.

5

> police employed an unnecessarily suggestive procedure, however, the identification testimony is not automatically excluded. *Perry*, 132 S. Ct. at 724. Instead, as a second step, we engage in a case-by-case analysis of whether the procedure gave rise to such a "substantial likelihood of misidentification" that admitting the identification would be a denial of due process. *Id.* If so, the identification evidence must be excluded. If, on the other hand, "the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." *Id.* at 720.

*United States v. Shavers*, 693 F.3d 363, 381–82 (3d Cir. 2012), *cert. granted, judgment vacated*, 133 S. Ct. 2877 (2013).[3]

But hold on. As *Shavers* observed, there is a threshold prerequisite of police involvement which must be satisfied before the *Neil/Manson* due process analysis comes into play:

> Recently, in *Perry v. New Hampshire*, the United States Supreme Court directed that courts should not reach the reliability inquiry unless the identification resulted from a situation created by improper police conduct.

*Id.* at 382 (citing *Perry*, 565 U.S. at 244–45, 132 S. Ct. at 728). It is now clear that the pretrial due process analysis applies only to out-of-court identification procedures that are conducted or arranged by the police. That requirement, anticipated by the Third Circuit,[4] was adopted by the U.S. Supreme Court in *Perry, supra*.

In *Perry,* a witness looked out her apartment window and saw a person breaking into cars in the building's parking lot. She reported the crime by telephone; a police officer promptly arrived and detained Mr. Perry. While a

---

3   The judgment was vacated on other grounds, involving the need for jury findings in relation to sentencing factors. A convoluted procedural history on remand followed.

4   *See United States v. Zeiler*, 470 F.2d 717 (3d Cir. 1972) (due process rule not implicated by witnesses' statements that they recognized defendant as bank robber from seeing his image on television); *United States v. Peele*, 574 F.2d 49, 491 (3d Cir. 1978) (without government involvement, question of suggestibility of witness does not require examination outside of presence of jury).

6

second officer minded Perry, the first officer went to the witness's apartment to interview her. When the officer asked her for a description of the thief, she went to the window and pointed to Perry, who was in the parking lot, still in the custody of the second officer. 565 U.S. at 233–34. The Court took it for granted that in general, a one-person "showup" of a person obviously in police custody would constitute an unduly suggestive identification procedure.

Justice Ginsburg, writing for an eight-member majority of the U.S. Supreme Court, held that these circumstances, however suggestive, would not justify withholding this eyewitness identification evidence from the fact finder. Perry, the Court held, was not entitled to a pretrial suppression hearing to consider exclusion of the witness's identification of him. Absent police misconduct, the fallibility of eyewitness identification is fodder for cross-examination. *Id.* at 244–46. Viewed in this way, it is no different from bias, poor vision, or other impediments to reliability. *Id.* at 244. The *Neil/Manson* due process analysis is tied, "not to suspicion of eyewitness testimony generally, but only to improper police arrangement of the circumstances surrounding an identification"—and the need to deter it. *Id.* at 241–42. Therefore, wrote Justice Ginsburg, "we hold that the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances *arranged by law enforcement.*" *Id.* at 242 (emphasis added). Unless the police arranged the allegedly suggestive identification, the reliability of eyewitness identification testimony is to be tested by the ordinary processes of a criminal trial, such as cross-examination before a properly instructed jury. *Id.* at 232–33.

Counsel for Mr. Jones attempts to bring our facts within the *Perry* holding. He offers that the authorities, if they did not literally arrange the out-of-court online photo identification, did permit these suggestive circumstances to arise. The State charged Mr. Jones with committing Bank Robbery 1, and the Prosecutor's office then sent Teller 1 a Victim/Witness Letter identifying

7

Jones by name. Although the Teller and Bank Manager acted on their own, their actions were prompted by the inclusion of Mr. Jones's name in the Victim/Witness letter. It was foreseeable to the police, says counsel, that Teller 1 and other witnesses would talk amongst themselves and do some internet research. The mugshot, too, was a police creation, although the website displaying it was concededly private.

I am not persuaded that this was the equivalent of a police-arranged showup, or out-of-court identification. Of course, in any criminal case, the police will probably appear somewhere in the chain of but-for causation leading to an out-of-court identification. But it is only a police-*arranged* identification procedure that triggers the due process remedy of pretrial exclusion from evidence.[5] Here, the connection between the police and the out-of-court identification was attenuated and indirect. In the days following the State charge, the police did not set up any identification procedure, suggestive or otherwise. Rather, the witnesses, upon learning that Mr. Jones had been charged, went online and did their own research. That may well furnish a basis for cross-examination, weaken their testimony in the eyes of the jury, or lay the foundation for expert testimony on the factors that may render eyewitness identifications unreliable. *See* Part IV, *infra*. It does not trigger the *Neil/Manson* due process remedy of a pretrial hearing and suppression.

---

[5]     *Perry* clarifies the distinction between suggestive circumstances, and police-arranged suggestive procedures with some examples:

> Out-of-court identifications volunteered by witnesses are also likely to involve suggestive circumstances. For example, suppose a witness identifies the defendant to police officers after seeing a photograph of the defendant in the press captioned "theft suspect," or hearing a radio report implicating the defendant in the crime. Or suppose the witness knew that the defendant ran with the wrong crowd and saw him on the day and in the vicinity of the crime. Any of these circumstances might have 'suggested' to the witness that the defendant was the person the witness observed committing the crime.

Id at 244, 132 S. Ct. at 727–28. Such circumstances, however "suggestive," do not implicate the due process rule of *Neil* and *Manson,* because they do not involve police-initiated identification procedures. *See id.*

8

Nor can the police be held responsible for the witnesses' learning of the State charges against Mr. Jones. That Mr. Jones had been charged in connection with Bank Robbery 1 was public information. It might have been permissibly published in a newspaper or aired on the evening news. (The record does not reveal whether there was any news coverage.) As it happens, that now-public information was included in a routine Victim/Witness letter sent by the County Prosecutor's Office of Victim Witness Advocacy. The letter was not sent as part of a police plan to plant a suggestion in the minds of witnesses. It was sent in fulfillment of a legal duty under the Rights of Crime Victims and Witnesses Act. That Act gives a victim/witness the rights, *inter alia,* to "be informed about the criminal justice process" and to "be advised of case progress and final disposition and to confer with the prosecutor's representative so that the victim may be kept adequately informed." N.J. Stat. Ann. § 52:4B-36. A simple notice disclosing that criminal charges have been filed and informing victim/witnesses of their rights is routinely sent to meet the minimal obligations of the prosecutor's office under the Act.[6]

Mr. Jones's counsel suggests that the police missed a two-month window of opportunity between February 2015, when the final DNA results came back, and April 2015, when Mr. Jones was charged. In that interlude, before the witnesses learned Mr. Jones's name, the police and FBI could have shown the bank employees a nonsuggestive photo spread. And that, says defendant, might have minimized the taint of the employees' later freelance investigation.

I accept for purposes of argument that the police could have done more to freeze the employees' out-of-court identifications in advance of the first State charge. That, in my view, is a far cry from the police having "arranged" an

---

[6] *Perry*, like the line of due process cases that preceded it, speaks in terms of an "unnecessarily" suggestive procedure. Thus, even where the police are literally responsible for arranging the procedure, their conduct may be justified under the circumstances. The government suggests that this Victim/Witness Letter falls under the "necessity" doctrine of *Stovall v. Denno*, 388 U.S. 293 (1967) (finding no due process violation where the police brought the defendant to the hospital room of a witness who was possibly dying). Because I find that this was not a police-initiated identification procedure at all, I do not reach that issue.

9

unnecessarily suggestive out-of-court identification procedure, as required by *Perry*. If defendant's suggested rule were accepted, then *Perry* itself would be impossible to explain. Surely the police in *Perry*, too, could have done better. It was more than foreseeable that the witness would look out her window; that, after all, is how she witnessed the theft in the first place. And the interviewing officer, instead of leaving Perry in custody in the parking lot, could have had the other officer whisk him out of sight. But Perry's presence in the lot, like the sending of a Victim/Witness Letter, was an ordinary incident of the investigation; these events did not rise to the level of a police-arranged identification procedure.

The February–April 2015 time lag, too, was an ordinary artifact of the investigation, not part of a police-arranged identification procedure. Mr. Jones asks that the Court apply *Perry*, not because the police arranged an identification, but because they *didn't* arrange an identification soon enough. That, in my view, is stretching the rule too far.[7]

One case somewhat helpful to defendant's position is *United States v. Shavers*, 693 F.3d 363 (3d Cir. 2012). One of that case's multiple out-of-court identification issues involved the placement of a prisoner-witness in the same holding cell as three defendants in connection with a (cancelled) suppression hearing. The witness recognized the three and identified them as the perpetrators. The court found this to be impermissibly suggestive, although the trial court's error in admitting the witness's identification testimony was ultimately found harmless. *Shavers* relied on a pre-*Perry* case, *United States v. Emanuele*, 51 F.3d 1123 (3d Cir. 1995), in which a witness, who had previously failed to identify the defendant from a photo array, did identify him after seeing U.S. Marshals frog-march him to the courtroom in manacles.

---

[7] I consider additional ramifications of the rule suggested by the defendant. In any case where the police were developing two cases against a defendant, presumably they would have to wait and charge both simultaneously. If they did not, they would expose themselves to a claim that the public announcement of the earlier charge impermissibly suggested guilt of the second offense. That is far beyond anything contemplated by *Perry* or the due process cases.

*Shavers,* like *Emanuele,* is helpful to Mr. Jones's argument in that it did not require that law enforcement officers have *intended* the situation to be suggestive. *Id.* at 387. But under *Perry,* the suggestive situation must have been actively created by the officers; *Shavers* explicitly contrasted *Perry,* in which the witness, concededly in response to police questioning, nevertheless "spontaneously" walked to the window on her own and pointed out the defendant. *Id.* (citing *Perry,* 535 U.S. at 235, 132 S. Ct. at 722).

This case is like *Perry,* not *Shavers.* As to the employees' online identification of Mr. Jones, there is not only a lack of law enforcement intent, but a lack of law enforcement involvement. Of course, as in *Perry,* law enforcement played *some* role. There, the officer was questioning the witness; here, the Prosecutor's Office had sent the Victim/Witness Letter. But in both cases, the identification "procedure" was initiated by the witnesses themselves, not by the police.

The motion to suppress identification testimony by Teller 1 and the Bank Manager on due process grounds is therefore denied.

### IV.   Rule 403 Motion

In the alternative, Mr. Jones argues that the bank eyewitnesses' identifications of him should be barred from evidence under the familiar Rule 403 balancing test:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 403. As grounds for finding "unfair prejudice," Mr. Jones cites the passage of time, weapons focus, stress, and the suggestive nature of the online mugshots.

Mr. Jones is correct to the extent he argues that it is not sufficient merely to find that an out-of-court identification does not violate due process. *Perry* itself contemplated that, even where the police did not arrange an

11

identification, its reliability would be tested by the ordinary processes of a criminal trial. *Id.* at 232–33. Those processes include "the presence of counsel at post-indictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt." *Id.* at 232–33. One of those "protective rules of evidence," of course, is Rule 403, which requires the Court to balance the probativeness of the evidence against the danger of "unfair prejudice" from its admission.

The probativeness of the bank witnesses' identification of the defendant is clear. This is a whodunit, or an identity case. There is no dispute that a bank robbery occurred, and there is no significant issue of intent. The significant issue to be tried is the identity of the robber. The bank employees' identification of the person who robbed the bank, then, is critical to the case, and highly probative of the central issue.

On the other side of the balance is the danger of unfair prejudice.[8] That danger, as I see it, takes two forms: unreliability and procedural disadvantage.

The unreliability inheres in the suggestiveness of the identification. The bank witnesses saw online the defendant's mugshot, identified as such. A photo of a person in the context of arrest carries an implication of criminality. It is not hard to imagine that it might consciously or subconsciously influence a witness, or diminish the witness's salutary fear of identifying the wrong person. The procedural disadvantage is that defense counsel cannot cross-examine the witnesses about the suggestiveness of the identification without using, or at least referring to, the mugshot—thereby exposing the jury to the same prejudicial circumstances that surrounded the identification itself.

In performing the relevant balancing, however, I consider that the jury will not be exposed to these facts in the same context that the witnesses were.

---

[8]    It bears repeating that Rule 403 addresses *unfair* prejudice. Mere prejudice, in the sense of harmfulness to the defendant's interests, is inherent in any piece of inculpatory evidence. Obviously evidence is not to be excluded because it tends to suggest defendant's guilt.

12

Rather, I assess the potential prejudice in the context of the safeguards available at a criminal trial. Those safeguards include the following.

Under the circumstances, I will grant the defense considerable latitude to cross-examine these witnesses about their online research and the effect it may have had on the reliability of their identifications. Assuming (as I do) that developments at trial warrant it, I will deliver instructions to the jury concerning the pitfalls of eyewitness identification and the care to be taken in considering it, particularly where the circumstances may have been suggestive.

Should a party seek to introduce the online photos, they will be suitably redacted to eliminate any reference to the criminal justice system. To the extent the jury surmises that these were arrest photos, it will not come as a surprise; they will necessarily know that, at the time the witnesses saw the photos, Mr. Jones had already been charged with Bank Robbery 1. The incremental prejudice, then, should be minimal. I will, however, prohibit any suggestion that these photos originated from an earlier arrest, unrelated to the Bank Robberies, to avoid the implication of a prior arrest or conviction.[9]

At-trial safeguards, *Perry* pointed out, have in recent years increasingly included the admission of "expert testimony on the hazards of eyewitness identification evidence." 535 U.S. at 247. As discussed in the following section of this Opinion, such testimony should generally be permitted, within the strictures of Article VII of the Federal Rules of Evidence. Lay jurors may well be unfamiliar with the psychological and other factors that can influence the reliability of identification testimony. Expert testimony, however, can help them form an educated judgment about the weight to be given such testimony under the circumstances of this case.

I add a word about the out-of-court identification, as opposed to in-court identification. I do not believe that it is possible to separate the two. It would be

---

[9] I have already ruled that, should Mr. Jones testify, he may be impeached with evidence of a prior conviction, identified only generically as a felony conviction. Should that occur, any potential incremental prejudice from the mugshot testimony would be further reduced.

13

misleading to present in-court identification testimony without reference to the possible taint of the witnesses' online research, and I expect that the suggestive effect of the out-of-court identification would be a major theme of the defense case. Like most issues, this is one for the jury to decide, with the benefit of full cross-examination and expert opinion testimony.

In the context of the safeguards of a trial, I conclude that the probativeness of this eyewitness identification testimony is not substantially outweighed by the danger of unfair prejudice. The defendant's motion to exclude eyewitness identification testimony on Rule 403 grounds is therefore denied.

## V.     Expert Motion

I briefly discuss the defendant's application, made at oral argument, for an adjournment of the trial date to permit him to secure an expert regarding the reliability of eyewitness identifications, and to admit such expert testimony. The government agrees in principle, reserving the right to object to particular portions of such opinion testimony under Federal Rule of Evidence 702 *et seq.*

The parties agree that one key relevant authority is *United States v. Brownlee,* 454 F.3d 131 (3d Cir. 2006). There, the police presented the defendant to the witnesses at the scene of the crime—in essence, a suggestive one-man showup, a procedure widely considered to create a danger of misidentification. The Court of Appeals upheld the denial of a motion to suppress on due process grounds. It held, however, that the district court erred when it excluded expert testimony as to certain factors affecting the reliability of identifications: the comparison between showups and other procedures; the suggestive effect of the showup; confidence malleability; post-event suggestiveness; and confidence as to accuracy. *Id.* at 140–41. It is far too late in the day to ignore the known tricks our minds can play: our susceptibility to suggestion, the lack of correlation between certainty and accuracy, the consensus effect of making an identification in a group setting, the distracting effect of a deadly weapon, and many others. *See id.* (discussing some of the

now extensive literature and case law authority on unreliability of eyewitness identifications); Def. Br. 8–11. The Court requires no persuasion on that point.

The parties also agree that *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1984), cited in *Brownlee*, remains good law and is pertinent. There, the court held that Rule 702 may permit a criminal defendant "to adduce, from an expert in the field of human perception and memory, testimony concerning the reliability of eyewitness identifications." *Id.* at 1226. Once the defendant has proffered such testimony, the Court is to balance two factors:

> (1) the reliability of the scientific principles upon which the expert testimony rests, hence the potential of the testimony to aid the jury in reaching an accurate resolution of a disputed issue; and (2) the likelihood that introduction of the testimony may in some way overwhelm or mislead the jury.

*Id.*

Such testimony must also meet the test of "fit": that is, it must involve the characteristics of the particular eyewitness identification in the case, and address how those characteristics bear on reliability. *Id.* at 1242; *see also Brownlee*, 454 F.3d at 141 (citing *United States v. Sebetich*, 776 F.2d 412, 419 (3d Cir. 1985)).[10] As stated above, Mr. Jones cites such factors as passage of time, weapons focus, stress, and the suggestive nature of the online mugshots. Presumably any expert testimony would be directed to those factors, not to other factors absent from the facts of this particular case.

Facially, this case presents the kind of facts that would make it appropriate for the jury to hear expert testimony on the reliability of eyewitness identifications. I hold generally that such testimony is appropriate and admissible. Absent a specific proffer, however, I can go no farther. I will

---

[10] Actually, the issue in *Brownlee* was not exclusion but restriction of the expert's testimony. The district court had permitted the expert to testify as to factors such as cross-racial identification, the effect of hair covering, weapons focus, and exposure to multiple witnesses, but excluded testimony as to other factors. *Id.* at 140. The lesson I draw is that the expert should be given full scope to discuss issues that "fit"— *i.e.*, ones that are pertinent to the facts and issues in the case. For example, weapons focus testimony would not be admitted in a case where no weapon was drawn, but it might be error to exclude it where a weapon was pointed at the victim.

therefore grant the defendant's application for a continuance of the trial date so that he can obtain the report of such an expert. Once the content of such testimony has been proffered in detail, I will consider any objections to particular items under the Rule 702 standards identified above.

## ORDER

Accordingly, IT IS this 27th day of February, 2017

ORDERED as follows:

1. The defendant's Eyewitness ID motion is denied. The related Rule 403 motion is denied, subject to the at-trial procedures outlined above.

2. The Expert Motion is substantially granted, although the Court reserves decision in part as to objections to particular items of testimony. The date of trial, currently scheduled for March 6, 2017, is adjourned until May 1, 2017. The government shall immediately submit a standard 60-day consent continuance order.

3. Within 21 days, the defense shall furnish the prosecution and the Court a report of its expert on eyewitness identification, summarizing that witness's proposed testimony in detail. Within 10 days thereafter, the government shall submit in writing its objections, if any, to the proffered expert opinion testimony. At that time, counsel will set up a telephone conference with the Court to determine what further procedures or submissions, if any, are necessary to resolve any such issues and ready the case for trial.

_____
KEVIN MCNULTY
United States District Judge