UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**GREGORY A. JONES** | **Criminal No. 16-516 (KM)**<br><br>**OPINION & ORDER** |

**MCNULTY, DISTRICT JUDGE**

Before the Court are the pro se and counseled motions (DE 103, 106) of defendant Gregory Jones for a reduction of sentence under the First Step Act, 18 U.S.C. § 3582(c)(1)(A), primarily based on his age, his health, and the risk of serious consequences from a COVID-19 infection while he is incarcerated. Having considered the parties' submissions, I decide this matter without oral argument. *See* Fed. R. Crim. P. 43(b)(4); *United States v. Styer,* 573 F.3d 151, 154 (3d Cir. 2009). For the following reasons, the motion is DENIED.

## I.    BACKGROUND

Having presided over the criminal case, I am fully familiar with the background, which I will summarize only briefly.

On May 15, 2017, Mr. Jones was convicted by a jury of bank robbery (Count 1), a second, armed robbery of the same bank (Count 2), and use of a firearm in relation to that second robbery (Count 3). *See* 18 U.S.C. §§ 2113(a) & (d), 924(c).

On February 15, 2018, this Court sentenced Mr. Jones to 120 months' imprisonment on Counts 1 and 2, to be served concurrently, and 120 months' imprisonment on Count 3, to be served consecutively, for a total sentence of 240 months. (DE 83, 85. *See also* Amended Judgment (DE 95).) That sentence represented a significant downward variance from the Guideline range of 360 months to life. The judgment was upheld on appeal. (DE 96.)

Mr. Jones is currently serving that sentence at FCI Allenwood Medium, a federal facility in Pennsylvania. His projected release date is January 2032. (DE

114-2.)

On December 15, 2021, Mr. Jones filed a pro se motion for compassionate release. (DE 103) I appointed counsel to represent him on that motion pursuant to the Criminal Justice Act.[1] (DE 104.) Counsel then submitted a second version of the motion for compassionate release (DE 106), to which the government has filed a response. (DE 114.) The matter is fully briefed and ripe for decision.

## II.    LEGAL STANDARDS

Once a term of imprisonment has been imposed, the Court may modify it only under very limited circumstances. *In re Morris*, 345 F. App'x 796, 797–98 (3d Cir. 2009) (citing 18 U.S.C. § 3582(c)). As relevant here, § 3582(c)(1) provides as follows:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--
>
> > (i) extraordinary and compelling reasons warrant such a reduction; [. . .]
> >
> > and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See also United States v. Pawlowski*, 967 F.3d 327, 329–30 (3d Cir. 2020).

---

[1]   Georgina Giordano Pallitto, Esq., is thanked for her acceptance of the appointment and for her able presentation of the issues.

The United States Sentencing Commission has promulgated a policy statement that, in relevant part, allows a court to grant compassionate release or a sentence reduction where: (i) extraordinary and compelling reasons warrant a reduction in a defendant's sentence; (ii) the defendant is not a danger to the safety of others or to the community; and (iii) release from custody complies with the section 3553(a) factors, to the extent applicable. U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 1B1.13 (U.S. SENTENCING COMM'N 2018).

The Sentencing Commission issued a policy statement defining certain circumstances that qualify as extraordinary and compelling. U.S.S.G. § 1B1.13, Application Note 1(A)–(D).[2] That policy statement was enacted at a time when only the BOP could move for compassionate release, however, and has not been amended since the enactment of the First Step Act. In prior cases, I accepted the emerging near-consensus that where a defendant makes a motion under the First Step Act, the court is not bound by that application note. The U.S. Court of Appeals for the Third Circuit, in a precedential decision, has now joined that consensus:

> The first issue is whether the District Court was bound by the Commission's policy statement. We conclude that it was not.

---

[2] The application note lists three specific circumstances that qualify as extraordinary and compelling. Generally speaking, the enumerated circumstances include: (i) a terminal illness or a serious medical condition that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover; (ii) the defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process, and has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less; or (iii) certain family circumstances exist where the defendant would be the only available caregiver for his or her minor child, spouse, or registered partner. U.S.S.G. § 1B1.13, Application Note 1(A)–(C). In addition, the Sentencing Commission included a catchall provision, which provides that "other reasons" may be sufficient if "[a]s determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in [the enumerated] subdivisions." *Id.*, Application Note 1(D).

3

> As the District Court noted, the text of the policy statement explicitly limits its application to Bureau-initiated motions. Thus, according to its plain language, the existing policy statement is not applicable—and not binding—for courts considering prisoner-initiated motions. In reaching this conclusion, we align with nearly every circuit court to consider the issue. *See United States v. Brooker*, 976 F.3d 228, 235 (2d Cir. 2020); *United States v. McCoy*, 981 F.3d 271, 282 (4th Cir. 2020); *United States v. Shkambi*, 993 F.3d 388, 393 (5th Cir. 2021); *United States v. Elias*, 984 F.3d 516, 519–20 (6th Cir. 2021); *United States v. Gunn*, 980 F.3d 1178, 1180–81 (7th Cir. 2020); *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021); *United States v. McGee*, 992 F.3d 1035, 1050 (10th Cir. 2021); *United States v. Long*, 997 F.3d 342, 355 (D.C. Cir. 2021). *But see United States v. Bryant*, 996 F.3d 1243, 1247–48 (11th Cir. 2021).

*United States v. Andrews*, 12 F.4th 255, 259 (3d Cir. 2021).

Thus the Guidelines policy statement does not limit what this Court, within its reasonable discretion, may find to be "extraordinary and compelling." Still, it remains a relevant and valuable guide, and is properly considered by a district court:

> The [district] court correctly recognized that although the policy statement is no longer binding, it still sheds light on the meaning of extraordinary and compelling reasons. "It is a commonplace of statutory interpretation that 'Congress legislates against the backdrop of existing law.' " *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, —— U.S. ——, 139 S. Ct. 1881, 1890, 204 L.Ed.2d 165 (2019) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013)). Because Congress reenacted the compassionate-release statute without any alterations to the phrase "extraordinary and compelling reasons," it was reasonable for the court to conclude that the phrase largely retained the meaning it had under the previous version of the statute. *See United States v. Johnman*, 948 F.3d 612, 619 (3d Cir. 2020) . . . .

*Andrews*, 12 F.4th at 260.

I therefore consider the grounds asserted by the defendant, whether or not specifically authorized by the Guideline policy statement. In particular, I consider whether the likelihood of COVID-19 infection, in conjunction with the prisoner's medical condition, rises to the level of extraordinary and compelling circumstances, and, if so, whether the purposes of sentencing would nevertheless be unduly undermined if he were released.

### III. ANALYSIS

#### A. Exhaustion of remedies

Before proceeding to the merits of a motion for a reduction in sentence, a defendant must meet § 3582(c)(1)(A)'s exhaustion requirement, which requires either that that the defendant has exhausted all administrative remedies, or that, since the submission of a request to the warden, 30 days have passed without a decision being rendered. *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). The United States concedes that Mr. Jones submitted a request for compassionate release to the Warden, based on his age, his asthma, and the risks of COVID-19 infection. That request was denied, but in any event 30 days have passed. The exhaustion requirement therefore does not stand as a bar to this motion.

#### B. Compassionate Release

##### 1. Extraordinary and compelling circumstances

Mr. Jones's First Step Act application for reduction of sentence is primarily based on the danger to his health if he should contract a COVID-19 infection while in the institutional setting of FCI Allenwood. My review of the petition and the records supplied to the Court yields the conclusion that there are no extraordinary and compelling circumstances here.

Logically, any assessment of extraordinary circumstances arising from the COVID-19 pandemic must consider (a) the likelihood that a COVID infection would have severe consequences for this particular person, and (b) the more general danger of infection at the institution where the person is incarcerated.

Courts, including this one, have routinely looked to the Centers for

Disease Control ("CDC") for guidance as to conditions that place a person at particular risk of serious consequences from a COVID-19 infection. *See People With Certain Medical Conditions*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (most recently updated as of Dec. 14, 2021) (cited herein as "CDC List"). "Older adults," *i.e.,* those over age 65, are far more likely than young persons to suffer serious consequences, and account for some 80% of COVID deaths. *Id.* Certain listed medical conditions are also recognized as risk factors. These, in abbreviated form, are Cancer, Chronic kidney disease, Chronic liver disease, Chronic lung disease (including "Asthma, if it's moderate to severe"), Dementia, Diabetes, Down syndrome, Heart conditions, HIV infection, Immunocompromised state, Mental health conditions, Overweight and obesity, Pregnancy, Sickle cell disease, Smoking, Solid organ or blood stem cell transplant, Stroke, Substance use disorders, and Tuberculosis. *Id.*

Mr. Jones is approximately 65 years old, at the threshold of being an "older adult." He initially identified asthma as a risk factor. His motion now lists "enlarged prostate, hypertension, high blood pressure, neoplasm, epilepsy/seizure disorder and hyperlipidemia," as well as osteoarthritis that requires him to use a wheelchair or a walker much of the time. (Def. Br. 3–4.)

**Asthma** is listed as a risk factor in the CDC List, but only in its "moderate to severe" form.[3] BOP medical records show that Mr. Jones suffers from no more than intermittent or mild asthma. (DE 114-1 at 61.) There are no recorded acute episodes. The condition has been medicated only with

---

[3] The National Asthma Education and Prevention Program describes "moderate persistent asthma" as present if any of the following is true: (i) symptoms occur daily and inhaled short-acting asthma medication is used every day; (ii) symptoms interfere with daily activities; (iii) nighttime symptoms occur more than 1 time a week, but do not happen every day; or (iv) lung function tests are abnormal (more than 60% to less than 80% of the expected value), and PEF [peak expiratory flow] varies more than 30% from morning to afternoon. *See* https://www.uofmhealth.org/health-library/hw161158; *see also* National Asthma Education and Prevention Program, Expert Panel Report 3: Guidelines for the Diagnosis and Management of Asthma 74, available at https://www.nhlbi.nih.gov/health-topics/guidelines-for-diagnosis-management-ofasthma.

Albuterol, which Mr. Jones reports using once a week or so. In short, all indications are that the asthma is mild and well controlled.

***Hypertension*** was formerly listed by the CDC as a factor that "might" present a risk. Currently, the CDC assigns it "possible" status: "Having heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and *possibly high blood pressure (hypertension)* can make you more likely to get severely ill from COVID-19." (CDC List; emphasis added).

I have gleaned from prison medical records for the preceding year the following sample blood pressure readings:

| | |
|---|---|
| 10/27/21 | 130/85 |
| 9/20/21 | 133/84 |
| 8/31/21 | 124/76 |
| 8/26/21 | 123/74 |
| 8/11/21 | 114/71 |
| 6/3/21 | 137/81 |
| 5/24/21 | 154/89 |
| 5/20/21 | 130/82 |
| 3/18/21 | 136/87 |

These indicate stage 1 hypertension at most. *See* American Heart Ass'n, Understanding Blood Pressure Readings, https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings. Such readings are not, however, particularly or unusually severe. More to the point, they do not suggest more than a "possible" link to severe consequences from COVID-19.

***Other conditions*** are not associated with any elevated risk. For example, urological complaints have been dealt with surgically and otherwise. Epilepsy/seizure disorder appears to be controlled by medication, with no seizures reported for a few years. Osteoarthritis has caused pain and difficulty in walking, to be sure, but does not place Mr. Jones in any particular danger.

I sympathize with, and do not minimize, the health problems Mr. Jones is experiencing. The question before the Court, however, is whether they

require that he be released because of some particular feature of incarceration. These are chronic conditions, and there is nothing unusual or extraordinary about them.[4] The prison medical records reveal that Mr. Jones has been receiving regular, conscientious, and appropriate medical care. Release is not required to ensure that he will continue to do so.

I move on to consider the likelihood of contracting COVID-19, and in particular whether the prison environment creates a particular risk that Mr. Jones will suffer a dangerous COVID infection. I do not dwell on the measures that the Bureau of Prisons has taken to contain infections in its facilities. https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp, Rather, I focus on the results, which appear to be quite good.

FCI Allenwood Medium is a medium-security institution that houses approximately 1151 prisoners.[5] The latest reported COVID figures for FCI Allenwood Medium are as follows

| Inmates Positive | Staff Positive | Inmate Deaths | Staff Deaths | Inmates Recovered | Staff Recovered |
| --- | --- | --- | --- | --- | --- |
| 75 | 0 | 0 | 0 | 481 | 54 |

https://www.bop.gov/coronavirus/  To be sure, these figures reveal that over the past two years there have been significant positive COVID test results among the inmates and staff, just as there have been in the community at large. Still, the current positive test rate of 6.5%,[6] while not ideal, is not severe,

---

[4]    The court gives individual consideration to each First Step applicant, in the context of that applicant's particular situation. Precedent must therefore be applied with great caution, and I apply no blanket rules. For what it is worth, however, the government has cited a significant body of case law finding that such chronic conditions are not extraordinary. (Gov't Brf. 26–27) I note in passing that hypertension and obesity are endemic, and hardly unusual. *See United States v. Tello*, 2021 WL 2005792, at *5 (E.D. Tex. May 18, 2021) ("according to the CDC, 42.5% of the adult population in the United States is obese and 73.6% is overweight. In addition, 45% of the adults in the United States (108 million) have hypertension, and of those, only about 24% have their condition under control.")

[5]    The Allenwood complex also includes a low security and a high security facility, FCI Allenwood Low, https://www.bop.gov/locations/institutions/alf/, and USP Allenwood, https://www.bop.gov/locations/institutions/alp/.

[6]    *I.e.*, 75 active positive test results divided into an inmate population of 1151.

8

either. Unlike New Jersey or the United States, FCI Allenwood Medium can boast a death rate, both currently and cumulatively, of zero.

Further reducing the risk to Mr. Jones is his immunity status following a prior COVID-19 infection and full vaccination.

Mr. Jones self-reports that, at some point, he contracted and recovered from a COVID-19 infection. (Def. Br. 2.) The CDC advise that a past infection confers a degree of immunity that tends to prevent or mitigate reinfection. https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html. Reinfections do occur, however. Mr. Jones does not report any COVID symptoms currently.

More significant is Mr. Jones's full-vaccination status. He received the initial dose of the Moderna vaccine on February 25, 2021, and the follow-up dose on March 24, 2021. (DE 141-2 at 152.) The record does not reveal whether he has received a booster.

I do not propose a full analysis of complex COVID-19 vaccine effectiveness statistics. Suffice it to say that the vaccines are highly effective at preventing infection and, when breakthrough infections occur, at reducing the severity of symptoms. *See* The Possibility of COVID-19 after Vaccination: Breakthrough Infections, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html; (updated Dec. 17, 2021). As of November 2021, unvaccinated adults in 28 US jurisdictions had four times the risk of testing positive for COVID-19, and fifteen times the risk of dying, when compared to fully vaccinated individuals. https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status. The ratios were greater for persons over 65 years of age. *Id.* As of December 2021, the rate of COVID-19 hospitalization for adults 65 and over was 17 times higher for the unvaccinated. https://covid.cdc.gov/covid-data-tracker/#covidnet-hospitalizations-vaccination. The rates are constantly changing, of course, but the CDC summarizes its effectiveness data as follows:

- **People who were unvaccinated had a greater risk of testing positive for COVID-19 and a greater risk of dying from COVID-19 than people who were fully vaccinated** (see below for the most recent rates).
- **Unvaccinated people in all age groups had higher case and death rates than fully vaccinated people in the same age groups.**
- **Case and death rates for people fully vaccinated with any of the three vaccine types (Moderna, Pfizer-BioNTech, Johnson & Johnson's Janssen) were much lower than for unvaccinated people.**

https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status[7]

I do not adopt the government's suggestion that vaccination absolutely precludes a finding of COVID-related extraordinary circumstances. I do agree with my colleagues, however, that vaccination is a highly relevant factor. *See generally United States v. Jaquwin Marlin,* No. CR 19-168 (SDW), 2021 WL 5711587, at *2 (D.N.J. Dec. 2, 2021) (declining to find extraordinary circumstances where defendant, although at higher risk as a result of obesity, had been vaccinated); *United States v. Dennison,* Crim. No. 09-402 (NLH), 2021 WL 5630296, at *2 (D.N.J. Dec. 1, 2021) (declining to find extraordinary circumstances where defendant had returned positive result for COVID infection and subsequently been vaccinated). I give Mr. Jones's vaccinated status considerable weight.

In short, I cannot find that Mr. Jones is at any unusual risk of COVID-19 infection, or serious consequences therefrom, as a result of his incarceration. I do not find that his circumstances are extraordinary and compelling.

### 2. 18 U.S.C. § 3553(a) Factors

Because the circumstances are not compelling, I discuss the factors under 18 U.S.C. § 3553(a) only briefly. The government argues that, even if compelling circumstances were present, application of the § 3553(a) factors would rule out an order of release. I agree.

The nature of the offense is serious, involving two bank robberies. One

---

[7]  For those who have received boosters, that hospitalization ratio is approximately tripled. *Id.* Because Mr. Jones's booster status is unknown, I have not focused on this aspect.

involved a bomb threat, and the other the actual discharge of a firearm.

Mr. Jones's criminal record encompasses some thirteen felony convictions, five of them involving the use of a weapon. He served an eight-year sentence for robbery and auto theft, and was released in 1983. From 1983 to 1991, he was convicted three times of selling illegal narcotics and once for illegal possession of a weapon. In 1992, he was convicted of six counts of robbery, involving use of a handgun, and one of aggravated assault. He was paroled in 2000. In 2002, he was convicted of distributing drugs near a school. He was paroled in 2005. From 2008 to 2021, he was convicted of creating a disturbance and possession of CDS. In 2013, he was convicted of robbing an individual with a handgun. He was sentenced to time served on December 20, 2013. It was just five months later that he perpetrated the first of the two bank robberies for which he is now serving his sentence.

At sentencing, I observed that Mr. Jones had remained undeterred from crime by multiple sentences of incarceration. (The government has attached a copy of the transcript at DE 114-4.) Unlike many 60-year-old defendants the court has seen, Mr. Jones had shown no signs of ageing out of his criminal behavior.

Mr. Jones met the criteria for career offender status under the Guidelines, and his imprisonment range was 360 months to life. I varied downward to a sentence of 240 months, with credit for time in state custody. That reduction was based, in part, on the fact that Mr. Jones was already in his sixties, and was already suffering from many of the medical conditions he has today. He nevertheless has some ten years left to serve, with good time credits. Release would represent a reduction to less than half of the well-deserved sentence that I imposed. *See generally United States v. Pawlowski*, 967 F.3d 327, 330 (3d Cir. 2020) (in pre-vaccine era, denying compassionate release application of inmate who had hypertensive heart disease, COPD, sleep apnea, and only one lung, was at increased risk should he contract COVID-19, in part because he had served less than 15% of 15-year sentence.)

The sentence imposed explicitly reflected the 3553(a) factors such as just

punishment, deterrence, and respect for the law. It also took into account Mr. Jones's age, medical history, and family ties. It is true that his condition has deteriorated somewhat, particularly in terms of his knee problems and mobility. Mr. Jones argues that the chances of recidivism, or being a danger to society, have dwindled as he has grown older. The sentence was designed, however, with the effects of aging in mind, and was intended to ensure that Mr. Jones would remain incarcerated until the threat of further criminal activity was well past.

I have considered Mr. Jones's medical situation and his age, as well as his contention that he no longer is a danger to the community. These factors are outweighed, in my estimation, by the need to maintain a sentence that reflects the seriousness of the offense and the need for punishment and deterrence.

Compassionate release under the First Step Act is therefore denied.[8]

### ORDER

The Court having reviewed the submissions, for the reasons expressed in the foregoing Opinion,

IT IS this 4th day of February, 2022

ORDERED that the pro se and counseled motions (DE 103, 106) of the defendant for compassionate release under the First Step Act is DENIED.

The clerk shall close the file.

/s/ Kevin McNulty
───────────────
Kevin McNulty
U.S. District Judge

---

[8] The motion, to the extent it may be seeking a transfer to home confinement, must be denied. The Court has no authority to grant such relief, which is reserved to the BOP under 18 U.S.C. § 3624(c)(2). *See United States v. Voda*, 994 F.2d 149, 151–52 (5th Cir. 1993); *Aigebkaen v. Warden,* No. 20-5732, 2020 WL 6883438, at *4 (D.N.J. Nov. 24, 2020) ("Pre-release placement decisions, such as transfers to home confinement, are committed to the BOP's sole discretion.").